698 S.E.2d 596

**The STATE, Respondent,**

v.

**Louis Michael WINKLER, Jr., Appellant.**

No. 26857.

Supreme Court of South Carolina.

Heard June 24, 2010.
Decided Aug. 16, 2010.
Rehearing Denied Sept. 22, 2010.

---

Chief Appellate Defender Robert M. Dudek and Appellate Defender Elizabeth A. Franklin–Best, both of Columbia, for Appellant.

Attorney General Henry D. McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Alphonso Simon, Jr., all of Columbia, and Solicitor J. Gregory Hembree, of Conway, for Respondent.

Chief Justice TOAL.

In this capital murder case, Louis Michael Winkler, Jr. (Appellant) appeals his sentence of death.[1]

## FACTS/PROCEDURAL HISTORY

Appellant kidnapped and sexually assaulted Rebekah Grainger Winkler (Victim) on October 10, 2005, five months before Victim was murdered.[2] That evening, Appellant's car was spotted behind the Seacoast Medical Center (Seacoast). Victim's car was found off the road in some trees and appeared to have been wrecked. There was blood on both of Victim's car seats, around the center console, and on the interior panel of the passenger's side door. The Horry County Police Department activated its dog team in an attempt to locate two missing persons. Victim was later found next to Stephen's Crossroads, which is where the magistrate's complex and library is located.

Phyllis Richardson (Richardson) arrived at the parking lot at Stephen's Crossroads around 7:30 a.m. on October 11, 2005, and saw a woman walking in the parking lot being followed by a man. Richardson noted the woman looked distraught and was acting confused, and that the man's hands were in the air as if he were raging and irritated. Shortly after Richardson

---

1. This case consolidates Appellant's direct appeal and the mandatory review provisions of S.C.Code Ann. § 16–3–25 (2003).

2. Victim was Appellant's estranged wife.

entered her office, she saw the woman from the parking lot on the phone in her office building. The woman's hair was matted and tangled with some bald spots. Richardson later learned the woman making the call was Victim. Curtis Thompson was the first officer to arrive at the building, and noticed some of Victim's hair looked like it had been ripped out, and she had black eyes, abrasions, and other scratches.

Victim was transported to Seacoast by EMS where Lisa Gore (Gore), a nurse at Seacoast, tended to Victim and noted her injuries to the left eye, some swelling in the jaw area, bruising around the neck, a fractured nose, an upper lip injury, redness under her right eye, corneal abrasions, multiple bruises and contusions, a bite mark to the face, and a large amount of hair removed from her head. A sexual assault kit was collected from Victim. The DNA found in the rectal and vaginal swabs from the sexual assault kit matched Appellant's DNA.

On October 11, 2005, Appellant was arrested for criminal sexual conduct, first degree, assault and battery with intent to kill, and kidnapping. Bond was initially denied; however, at a second bond hearing, Appellant's bond was set at $150,000 and he was required to wear an electronic monitor while out on bond. At a third bond hearing, Appellant's bond was amended to allow him to remove his electronic monitor for two hours so he could seek employment between the hours of 4 p.m. and 6 p.m. Appellant was out of jail on bond on the day Victim was murdered.

At around 5:30 p.m. March 6, 2006, Appellant kicked in the door to Victim's condominium. Appellant knocked Victim's son, Jonathan G. (Jonathan), onto the ground and then shot Victim once in the face at point blank range. According to the forensic pathologist who conducted Victim's autopsy, death occurred instantly. Appellant then walked over and pointed the gun at Jonathan. Shortly thereafter, Appellant left the condominium.

Appellant hid in the woods for two weeks. When police apprehended Appellant,[3] they recovered a Jennings .380 pistol

---

3. Three days after the murder, police searched Appellant's residence and found a piece of paper with Victim's address on it. However,

from his right front pants pocket. Five live rounds were found in the pistol, but there was not a live round in the port. During a full search of Appellant, police recovered eighteen rounds of .380 ammunition, a guard lock blade knife, and a wallet. In the wallet, there was a newspaper clipping about the shooting and murder.

Appellant was tried and found guilty of murder, first-degree burglary, and assault and battery of a high and aggravated nature. At trial, the State sought to establish two statutory aggravating circumstances: (1) the murder was committed during the commission of a burglary; and (2) the murder was of a witness or potential witness committed at any time during the criminal process for the purpose of impeding or deterring prosecution of any crime. S.C.Code Ann. § 16–3–20(C)(a)(1)(c), (C)(a)(11) (2003 & Supp.2009). The jury recommended that Appellant be sentenced to death.

During the guilt phase of Appellant's trial, Mary Elizabeth C. (Mary), Jonathan's friend, testified that on the evening of the murder she was on the phone with Jonathan when she heard a loud pop noise, and a voice that was not Jonathan's say, "I told you I'd be back. I'm not going to jail you stupid bitch, and I'm not—I'm back, I'm back. I'm never going back to jail." Mary then heard a hit and the phone went to static. Andrew Cooper (Cooper), a former crime scene technician for the Horry County Police Department, testified that it appeared there had been a forced entry because the door jamb, door frame, lock mechanism, and other parts of the door had been broken. Cooper also testified that a reddish colored liquid was collected from the kitchen countertop. Kimberly Hahn, a former State Law Enforcement Division (SLED) scientist, testified that she compared the blood swabs recovered from the counter of Victim's residence to Appellant's blood standard, and the blood from the counter matched Appellant's blood profile. Cooper testified that a projectile was recovered from the baseboard of the wall behind Victim. A firearms and toolmark examiner for SLED testified that the Jennings pistol found on Appellant when apprehended fired. the bullet recovered from Victim's baseboard.

police were not able to find Appellant until March 20, 2006, two weeks after the murder.

During the sentencing phase of Appellant's trial, Jill Shelley (Shelley), Victim's older daughter, testified that in September 2005, six months before the murder, she could not contact Victim on the phone so she drove to Victim's home. When she arrived at Victim's residence she saw that Victim was beat up and her arms were covered in bruises. Appellant later arrived, started kicking the door, and was screaming for Victim to let him in. Shelley threatened to call the police. Appellant responded that Victim knew what would happen if they called the police. Shelley testified that Victim moved out of Appellant's home as a result of that confrontation. One piece of evidence presented by the State was a letter sent by Appellant to Shelley while Appellant was incarcerated. In the letter Appellant asserted that had Shelley not gotten involved, Victim would still be alive.

## ISSUES

I. Did the trial court err in admitting an audio tape recording as a prior consistent statement under Rule 801(d)(1)(B), SCRE?

II. Did the trial court err in allowing the jury to review the transcript of the 911 tape?

III. Did the trial court err in refusing to allow Appellant to represent himself during the sentencing phase of trial?

IV. Did the trial court err in not conducting a full *Faretta* inquiry?

V. Did the trial court err in allowing defense counsel to present mitigation evidence to which Appellant objected?

VI. Did the trial court err in denying Appellant's motion for a directed verdict on the aggravating circumstance outlined in S.C.Code Ann. § 16–3–20(C)(a)(11)?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only. We are bound by the trial court's factual findings unless they are clearly erroneous." *State v. Wilson,* 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001) (citations omitted). "This Court does not re-evaluate the facts based on its own

view of the preponderance of the evidence but simply deter-
mines whether the trial judge's ruling is supported by any
evidence." *Id.* at 6, 545 S.E.2d at 829. "The admission or
exclusion of evidence is left to the sound discretion of the trial
judge, whose decision will not be reversed on appeal absent an
abuse of discretion." *State v. Saltz,* 346 S.C. 114, 121, 551
S.E.2d 240, 244 (2001). "An abuse of discretion occurs when
the conclusions of the trial court either lack evidentiary sup-
port or are controlled by an error of law." *State v. Pittman,*
373 S.C. 527, 577, 647 S.E.2d 144, 170 (2007) (citation omitted).

## LAW/ANALYSIS

### I. Rule 801(d)(1)(B), SCRE

■ Appellant argues the trial court erred in admitting as a
prior consistent statement under Rule 801(d)(1)(B), SCRE an
audio tape recording of Jonathan's interview with police on the
evening of the murder. We disagree.

■ Prior consistent statements are not hearsay if:
The declarant testifies at the trial or hearing and is subject
to cross-examination concerning the statement, and the
statement is ... consistent with the declarant's testimony
and is offered to rebut an express or implied charge against
the declarant of recent fabrication or improper influence or
motive; provided, however, the statement must have been
made before the alleged fabrication, or before the alleged
improper influence or motive arose.

Rule 801(d)(1)(B), SCRE. In order for a prior consistent
statement to be admissible pursuant to Rule 801(d)(1)(B), the
following elements must be present:
(1) the declarant must testify and be subject to cross-
examination, (2) the opposing party must have explicitly or
implicitly accused the declarant of recently fabricating the
statement or of acting under an improper influence or
motive, (3) the statement must be consistent with the de-
clarant's testimony, and (4) the statement must have been
made prior to the alleged fabrication, or prior to the exis-
tence of the alleged improper influence or motive.

*Saltz,* 346 S.C. at 121–22, 551 S.E.2d at 244.

Jonathan testified that he saw Appellant shoot and kill his
mother. During cross examination, Jonathan testified that his

father was Roger Grainger (Grainger). He also testified that Grainger was the only person he called "dad," and that he did not refer to Appellant as "dad." Defense counsel asked Jonathan if he remembered telling the first officer who arrived on the scene that it was his dad who shot his mother. Jonathan denied he told the officer that it was his dad, and stated he told the officer it was his stepdad. Jonathan also testified that Grainger was supposed to arrive at the condominium around 6 p.m. on the night of the murder.

Officer Thomas Knoch (Knoch), the first officer to arrive at the scene of the murder, testified that as he was heading up the steps to the condominium the following conversation took place between him and Jonathan, "He said he's gone, and I asked him. I said who. . . . He said my dad. . . ." Knoch also testified that in his report he wrote, "When I asked him who, he said my dad."

Detective Ann Pitts (Pitts) testified that she spoke with Jonathan on the evening of the shooting and recorded the conversation. The state moved to enter the tape recorded conversation into evidence. In the statement to Pitts, Jonathan identified Appellant as the man who broke into the condominium and shot Victim. Appellant objected and the court overruled Appellant's objection under Rule 801(d)(1)(B), SCRE.

We hold that Jonathan's statement to Pitts was a prior consistent statement admissible under Rule 801(d)(1)(B), SCRE. First, Jonathan testified at trial and was subject to cross-examination. Second, Appellant accused Jonathan of recently fabricating the statement. Appellant was accusing Jonathan of lying when Jonathan testified that he told Knoch it was his stepdad who shot his mother, not his dad. This alleged fabrication was necessarily recent because it happened during the trial. Third, Jonathan's statement to Pitts was consistent with his testimony at trial. Fourth, the statement to Pitts occurred before the alleged recent fabrication. Thus, all of the elements of Rule 801(d)(1)(B), SCRE are satisfied and the trial court committed no error in allowing into evidence Jonathan's statement to Pitts.

## II. 911 Tape

 Appellant argues the trial court erred in allowing the jury to view the transcript of the 911 tape while the jurors were listening to the tape during deliberations. We disagree.

 "The trial judge, in his discretion, may permit the jury at their request to review, in the defendant's presence, testimony after beginning their deliberations." *State v. Plyler*, 275 S.C. 291, 298, 270 S.E.2d 126, 129 (1980). "The extent of such review is within the discretion of the trial judge to be exercised in the light of the jury's request." *Id.* The court is not required to submit evidence to the jury for review beyond that specifically requested but in its discretion may have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested. *Id.* In *Plyler*, the trial court allowed the jury to hear a tape of the testimony of the defendant's ex-wife in response to the jury's request to have her testimony read back to them. *Id.* In that case, this Court found there was no abuse of discretion where only the direct examination was played and the trial judge denied the defendant's motion that the jury be required to also hear the cross-examination to prevent overemphasis of the portion reheard. *Id.*

In this case, during jury deliberations, the jury sent the judge a question asking if they could read the 911 transcript. Appellant argued the transcript was not part of the trial record, was only offered as an aid to the tape recording, and was never put into evidence. The trial court replayed the 911 tape for the jury in the courtroom and the jury was allowed to review the transcript while the tape played, which mirrored the way in which the evidence was presented at trial.[4] This was done in Appellant's presence at the request of the jury. Thus, the judge exercised proper discretion and committed no error in allowing the jury to read the transcript while listening to the 911 tape.

## III. Self-representation

 Appellant argues the trial court abused its discretion by refusing to allow Appellant to represent himself during

---

4. Appellant offered no objection to the introduction of the 911 transcript at trial, nor did he object to the transcript being read while the 911 tape played.

the sentencing phase of the trial. We disagree.[5]

An accused may waive the right to counsel and proceed *pro se*. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). However, "[a] defendant's right to waive the assistance of counsel is not unlimited." *State v. Fuller*, 337 S.C. 236, 241, 523 S.E.2d 168, 170 (1999). "The request to proceed pro se must be clearly asserted by the defendant prior to trial." *Id.* (citation omitted). "If the request to proceed pro se is made after trial has begun, the grant or denial of the right to proceed pro se rests within the sound discretion of the trial judge." *Id.* (citing *United States v. Singleton*, 107 F.3d 1091 (4th Cir.1997); *United States v. Lawrence*, 605 F.2d 1321 (4th Cir.1979)). "Once trial commences, that right [to proceed pro se] is subject to the trial court's discretion which requires a balancing of the defendant's legitimate interests in representing himself and the potential disruption and possible delay of proceedings already in progress." *U.S. v. Wesley*, 798 F.2d 1155, 1155–56 (8th Cir.1986) (citations omitted); *see also U.S. v. Stevens*, 83 F.3d 60, 66–67 (2d Cir.1996) ("[O]nce a trial has begun, a defendant's right to represent himself 'is sharply curtailed,' and the judge considering the motion must weigh 'the prejudice to the legitimate interests of the defendant' against the 'potential disruption of proceedings already in progress.'"). The sentencing phase of a capital trial does not constitute a separate trial. *See* S.C.Code Ann. § 16–3–20(B) (2003); *see also State v. Stewart*, 288 S.C. 232, 235, 341 S.E.2d 789, 791 (1986).

Appellant did not make his request to proceed *pro se* at the beginning of trial. Appellant made his request to proceed *pro se* at the beginning of the sentencing phase, which is not a separate trial. Thus, review of this issue is governed by the abuse of discretion standard outlined above and Appellant's right to represent himself was sharply curtailed by his failure to exercise this right prior to trial.

The trial court did not abuse its discretion in denying Appellant's request to proceed *pro se* at the sentencing phase of the trial. First, the trial court noted it was concerned that Appellant's medication would affect his ability to properly and

---

**5.** Issue three condenses Appellant's third and fourth issues on appeal into one issue.

fully function as his own counsel. Second, the trial court was concerned that allowing Appellant to represent himself during the sentencing phase would require some delay for Appellant to fully prepare. Third, the trial court was concerned the jury may be confused to have the first half of the case tried by counsel and the second half tried without counsel, especially if the jury could see counsel at Appellant's counsel table. For these reasons, the trial court properly considered the legitimate interests of Appellant and the potential disruption of the proceedings already in progress. Hence, the trial court's decision to not allow Appellant to proceed *pro se* during the sentencing phase of trial was not an abuse of discretion and, therefore, nor error.

## IV. *Faretta* Warnings

Appellant argues the trial court erred by failing to properly provide Appellant with *Faretta* warnings when Appellant sought to proceed *pro se* at the beginning of the sentencing phase. We disagree.

As noted above, Appellant did not timely waive his right to counsel and proceed *pro se.* Hence, Appellant's reliance on *Faretta* is misplaced. Had Appellant moved to proceed *pro se* before the trial began, then *Faretta* would apply. Moreover, Appellant contends that *Fuller* requires reversal. In *Fuller,* the defendant moved to proceed *pro se* before the trial began. 337 S.C. at 241, 523 S.E.2d at 170. However, in this case, Appellant did not seek to proceed *pro se* until the sentencing phase. Appellant's reliance on *Faretta* and *Fuller* is misplaced, and the trial court properly considered the legitimate interests of Appellant and the potential disruption of the proceedings already in progress.[6]

## V. Mitigating Social History

■■■ Appellant contends the trial court erred by allowing defense counsel to present mitigating social history evidence and call Appellant's family members as mitigation witnesses over Appellant's objection. We disagree.

---

**6.** Even if *Faretta* were applicable, the record reflects the trial judge met the *Faretta* standard by adequately warning Appellant of the dangers of self-representation.

"An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon,* 543 U.S. 175, 187, 125 S.Ct. 551, 560, 160 L.Ed.2d 565, 578 (2004) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674, 694 (1984)). "That obligation, however, does not require counsel to obtain the defendant's consent to 'every tactical decision.'" *Id.* (quoting *Taylor v. Illinois,* 484 U.S. 400, 418, 108 S.Ct. 646, 657, 98 L.Ed.2d 798, 816 (1988)). The introduction of the mitigation evidence at issue was a tactical decision made by Appellant's trial counsel and is reviewed on a case by case basis. The mitigation evidence presented served the purpose of humanizing Appellant to the jury. We find the introduction of this mitigation evidence was a tactical decision made by trial counsel and the trial court committed no error in admitting mitigating evidence that Appellant did not want to be introduced.

## VI. S.C.Code Ann. § 16–3–20(C)(a)(11)

Appellant argues the trial court erred by refusing to direct a verdict on the statutory aggravating circumstance of the murder of a witness to impede or deter prosecution of a crime. We disagree.

"In determining whether to submit an aggravating circumstance to the jury, the trial court is concerned only with the existence of evidence, not its weight." *State v. Smith,* 298 S.C. 482, 485, 381 S.E.2d 724, 726 (1989). "The trial judge should submit a statutory aggravator to the jury if there is any evidence, direct or circumstantial, to support it." *State v. Lindsey,* 372 S.C. 185, 194–95, 642 S.E.2d 557, 562 (2007).

The aggravating circumstance at issue is "[t]he murder of a witness or potential witness committed at any time during the criminal process for the purpose of impeding or deterring prosecution of any crime." S.C.Code Ann. § 16–3–20(C)(a)(11) (2003 & Supp.2009). The State established there was an ongoing criminal process from 2005 against Appellant for criminal sexual conduct, first degree, assault and battery with intent to kill, and kidnapping at the time Victim was murdered. Victim, as the victim in the 2005 crimes, was

clearly a potential witness in Appellant's trial on these three charges. There was circumstantial evidence to support a finding that Appellant murdered Victim to impede or deter prosecution of the charges listed above. Jonathan testified that Appellant stated, "you thought I was going to prison," when he broke into the condominium. Mary testified she heard a loud pop noise, and a voice that was not Jonathan's say, "I told you I'd be back. I'm not going to jail you stupid bitch, and I'm not—I'm back, I'm back. I'm never going back to jail." Shelley testified that Appellant warned Victim that she knew what would happen if someone called the police. Lastly, in the letter from Appellant to Shelley written while Appellant was incarcerated, Appellant asserted that Victim would still be alive had Shelley not gotten involved in Victim's life. This evidence is circumstantial evidence to support the statutory aggravating circumstance contained in section 16–3–20(C)(a)(11), and the trial court is affirmed in its denial of Appellant's motion for a directed verdict.

## PROPORTIONALITY REVIEW

Pursuant to S.C.Code Ann. § 16–3–25(C) (2003), we have conducted a proportionality review and find the death sentence was not the result of passion, prejudice, or any other arbitrary factor. Furthermore, a review of other decisions demonstrates that Appellant's sentence is neither excessive nor disproportionate. *See, e.g., State v. Williams*, 386 S.C. 503, 690 S.E.2d 62 (2010); *State v. Tucker*, 324 S.C. 155, 478 S.E.2d 260 (1996).

## CONCLUSION

For the aforementioned reasons, Appellant's conviction and sentence are affirmed.

BEATTY, KITTREDGE, HEARN, JJ., concur.
PLEICONES, J., concurring in result only.