# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Appellant,

v.

Richard M. Quinn, Jr., Respondent.

Appellate Case No. 2018-000494

Appeal From Richland County
Carmen T. Mullen, Circuit Court Judge

Opinion No. 27966
Heard October 15, 2019 – Filed May 6, 2020

## DISMISSED IN PART, AFFIRMED IN PART

First Circuit Solicitor David Michael Pascoe, Jr., and Assistant Solicitor William Baker Allen, Jr., both of Orangeburg, for Appellant.

Matthew Terry Richardson, of Wyche Law Firm, of Columbia, for Respondent.

**JUSTICE HEARN:** This appeal arises from special prosecutor David Pascoe's State House public corruption probe involving former South Carolina House Representative Rick Quinn, Jr., who pleaded guilty to a charge of statutory misconduct in office in February 2018. Following the plea hearing, the State grew concerned about the plea's validity because Quinn only admitted to a limited set of

facts supporting the indictment. Believing the plea lacked a sufficient basis, the State moved to vacate the guilty plea, reconsider the sentence, and for the court's recusal. The State appeals the order denying those motions. We dismiss the State's appeal of the guilty plea and affirm the trial court's order as to the sentence and recusal issues.

## FACTUAL/PROCEDURAL BACKGROUND

Respondent Rick Quinn, Jr. is a former member of the South Carolina House of Representatives, representing constituents in Richland and Lexington counties from 1989-2004 and 2010-2017 and serving as House Majority Leader from 1999-2004. He owned and operated a mail business called Mail Marketing Strategies (MMS) in Columbia, while his father owned and operated a political consulting firm, Richard Quinn & Associates (RQ&A).

In 2014, Attorney General Alan Wilson designated First Circuit Solicitor David Pascoe as special prosecutor to conduct a State grand jury investigation into alleged public corruption committed by current and former members of the South Carolina General Assembly.[1] The present case arose from a prior State grand jury investigation of former House Speaker Bobby Harrell, which resulted in six counts of misusing campaign funds, to which he pleaded guilty. During the course of the investigation into Speaker Harrell, SLED uncovered potentially criminal conduct by Representative Jimmy Merrill and Representative Rick Quinn, and a second grand jury investigation was initiated to investigate the conduct of these two individuals. The investigation focused on Quinn's practice of using his office as House Majority Leader and leader of the House Republican Caucus to direct mailing and political services to his family's businesses.

As a result of Pascoe's investigation, Quinn was charged in May 2017 with statutory misconduct in office in violation of section 8-1-80 of the South Carolina Code of Laws, and common law misconduct in office. In October 2017, he was also charged with criminal conspiracy in violation of section 16-17-410. Quinn's father's business, First Impressions, Inc. d/b/a RQ&A, was also indicted for failing to register as a lobbyist under section 2-17-20. Thereafter, several things occurred which caused the State concern. In November 2017, the court severed Respondent's case

---

[1] We note the public corruption probe in these matters has extended for more than five years, and we trust that it is drawing to a close.

from his father's, despite the State's motion to consolidate the two trials, which the defense opposed on several grounds.[2]  In addition, the State believed a conference call occurred on December 12, 2017, between the court, the State, and counsel for Respondent and his father in which the court inquired as to whether the parties remembered granting permission to have *ex parte* communication on a prior occasion while in Beaufort.  The court disputed that any *ex parte* communication took place other than when the court and the parties spoke in chambers before the guilty plea hearing.

At the plea hearing on December 13, 2017, Respondent entered a guilty plea pursuant to an agreement with the State that resolved charges against both him and his father.  Specifically, the agreement provided that Respondent would plead guilty to statutory misconduct in office, while the two remaining indictments against him would be dismissed, and that First Impressions would plead guilty and pay restitution in the amount of $3,000.00.  Also as part of the plea agreement, Respondent was permitted to enter a "limited allocution"[3] and the State would make

---

[2] Respondent's father opposed consolidation due to: a scheduling conflict; the possibility that the two could not be called as a witness in the other's trial; the evidence regarding Respondent would have a prejudicial effect on his father's defense; his father's age and health; and the possibility of confusion of the issues.  Respondent opposed consolidation so that his trial could take place before the March 15th candidate filing deadline and also noted that his father's counsel had not had sufficient time to prepare their case.

[3] We agree with the trial court's characterization of Respondent's allocution as a limited admission of facts, rather than a traditional allocution statement.  An "allocution statement" is when, after pleading guilty, a defendant is offered a formal opportunity to address the court to express remorse and explain personal circumstances that might be considered in sentencing.  Allocution statements assist the court in determining whether there is a sufficient factual basis to support the charge and the plea and whether the defendant's plea was "knowingly, voluntarily, and intelligently made."  A defendant is not required to exercise his right to submit an allocution statement, and lawyers are permitted to submit a statement on the defendant's behalf. *What is an Allocution Statement?* AM. BAR ASS'N (Nov. 20, 2018), https://www.americanbar.org/groups/public_education/publications/teaching-legal-docs/what-is-an-allocution-statement-/.

a much broader factual presentation before sentencing. In his limited allocution, Respondent agreed to the following:

> Rick Quinn agrees that in 2015, while a member of the House of Representatives, he failed to report to House Ethics Committee the name of USC, which he knew was a lobbyist principal and which in the previous calendar year leased office space for less than $30,000 total from Capitol Investments II, LLC, a business with which Rick was associated as a compensated agent by receiving a benefit from Capitol Investments II by being relieved from the payments on the mortgage note on the property as a guarantor and also by helping negotiate the mortgage note.

Although the State was provided with Respondent's limited allocution in writing prior to the plea hearing, it lacked information regarding the basis of his statement—that he had received an economic benefit from USC which he failed to report as a lobbyist's principal. During the hearing, the State presented a PowerPoint detailing the Quinn family businesses and alleging that Quinn's misconduct in office consisted of several acts occurring between April 1, 2010 and April 15, 2017, for which the State charged him with one count of a "continuing offense." Specifically, the State claimed that through his family businesses, Respondent knowingly received an improper economic benefit by virtue of his positions as House Majority Leader and leader of the House Republican Caucus. In its presentation, the State explained Respondent failed to disclose over $4 million received from lobbyist's principals, such as SCANA, AT&T, Palmetto Health, and USC, and voted as sponsor on legislation concerning those companies. The State showed the court documents indicating Respondent held himself out as an RQ&A employee despite his denial that he was associated with his father's business. The State also claimed Respondent funneled money from the House Republican Caucus's operating account to his family's businesses while he was House Majority Leader.

Respondent entered a guilty plea pursuant to the plea agreement, and the court accepted the plea, finding a substantial factual basis existed and that Respondent's decision to plead guilty was reasonably and intelligently given. There was no objection to the plea by either party during the proceeding. At the end of the hearing, due to the lateness of the hour, the court decided to defer sentencing for two months.

While awaiting that hearing, both parties filed sentencing memoranda. Respondent asked the court for probation rather than a prison sentence, arguing his

conduct did not warrant imprisonment when compared to the misconduct of other public officials. In contrast, the State, after reviewing the plea hearing transcript, raised issues for the first time regarding the plea's validity and requested the plea be cured prior to sentencing or that it be vacated entirely. The State's concern stemmed from its inability to locate any payments made by the University of South Carolina to Capitol Investments II, LLC, in 2015; accordingly, it believed that Respondent's limited allocution did not satisfy the elements of statutory misconduct in office under section 8-1-80, but rather constituted only an unintentional failure to file under section 8-13-1130. Therefore, the State specifically requested the court, prior to sentencing, to clarify whether Respondent *intentionally* failed to report to ensure the elements of statutory misconduct in office were satisfied and the plea was sufficient. The State also asked the court to consider the State's factual presentation in determining Respondent's sentence and to sentence Respondent to the maximum one-year imprisonment.[4]

On February 12, 2018, the trial court held a sentencing hearing for Respondent and First Impressions, Inc. In response to the State's request, the court conducted a second colloquy with Respondent in which it confirmed he was guilty of statutory misconduct in office for intentionally failing to report income from USC, a lobbyist's principal. In announcing the sentence, the court seemed to apply the presumption of innocence with regard to any other misconduct the State presented and to which Respondent did not admit in his limited allocution. The court then sentenced Respondent to the maximum possible punishment for statutory misconduct in office—one-year imprisonment suspended to two years' probation and a $1,000.00 fine—as well as an additional 500 hours of public service. Both before and after sentencing, the State attempted to object to the plea, but the court indicated appeal was the State's only avenue of relief. At the end of the hearing, the State requested the court to recuse itself from the proceedings, which the court refused to do. Following the sentencing hearing, the court reporter published a comment on The State newspaper's website through Facebook, stating "[w]hen a solicitor passes up a

---

[4] The State further elaborated its concerns regarding the plea in a letter to the court dated January 25, 2018, and requested the court cure any defects in the plea at the sentencing hearing. In the letter, the State explained that additional documents Respondent provided assuaged its concerns regarding payments by USC to Capitol Investments II, LLC.

golden opportunity to go to trial, but won't take responsibility for agreeing to a plea = classic cop out.  Don't blame it on the judge."[5]

Thereafter, the State filed a motion to reconsider the sentence, or in the alternative, vacate the plea, and again requested the court to consider its factual presentation in sentencing Respondent.  The court denied the motion, finding a substantial basis existed to accept the plea, reaffirming its consideration of the State's facts in sentencing, and refusing to recuse itself.  The State appealed the court's denial of its motion to reconsider to the court of appeals.  Respondent moved to dismiss the State's appeal, which the court of appeals denied, permitting the parties to fully brief the appealability issue along with the merits.  Respondent requested this Court to certify the case for immediate review pursuant to Rule 204(b), SCACR, which this Court granted.

Following oral argument in this case, this Court requested additional briefing from the State, Respondent, and the Attorney General regarding the execution of certain corporate integrity agreements stemming from the public corruption probe.  While we originally scheduled oral argument on this issue, it was cancelled due to the interruption in court operations caused by Covid-19.  We will now address this issue as well as the continued authority of Solicitor Pascoe during oral arguments in *State v. Harrison*, Appellate Case No. 2018-002128.

## ISSUES PRESENTED

1. Can the State appeal a guilty plea, which was entered and agreed to by the parties based on a plea agreement, and that the trial court accepted without objection?

2. Did the trial court err in sentencing Respondent based solely on his limited allocution and cloaking Respondent with the presumption of innocence regarding other misconduct described in the State's factual presentation, when Respondent pleaded guilty to an indictment for a continuing offense?

---

[5] Glenn Smith, *Court reporter removed from Statehouse misconduct case after criticizing prosecutor online*, POST & COURIER (Feb. 27, 2018), http://www.postandcourier.com/news/court-reporter-removed-from-statehouse-misconduct-case-after-criticizing-prosecutor/article_a63c7afe-1bda-11e8-8874-07ffa47106ae.html.

3. Did the trial judge's conduct throughout Respondent's guilty plea and sentencing, including her solicitation of *ex parte* communications, provide sufficient evidence of judicial bias to merit her recusal on appeal?

## STANDARD OF REVIEW

In criminal cases, this Court reviews only errors of law. *State v. Anderson*, 415 S.C. 441, 446, 783 S.E.2d 51, 54 (2016). Thus, the trial court's factual findings are binding on the Court unless unsupported by the evidence, clearly erroneous, or controlled by an error of law. *State v. Winkler*, 388 S.C. 574, 582, 698 S.E.2d 596, 600 (2010). On appeal, the reviewing court does not reevaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial judge's ruling is supported by any evidence. *State v. Parker*, 391 S.C. 606, 611-12, 707 S.E.2d 799, 801 (2011). Absent evidence to the contrary, this Court presumes the regularity and legality of criminal proceedings. *Weathers v. State*, 319 S.C. 59, 62, 459 S.E.2d 838, 839 (1995).

## LAW/ANALYSIS

### I.    GUILTY PLEA

We begin by addressing the threshold question of whether the State may appeal a guilty plea of its own design and agreement, which was accepted by the trial court. Respondent contends the Double Jeopardy Clauses of the United States and South Carolina Constitutions prohibit the State from attempting to invalidate the guilty plea on appeal. Because jeopardy has attached, Respondent requests the Court dismiss this appeal. In addition, Respondent argues the State is not an aggrieved party pursuant to Rule 201(b), SCACR, because it prevailed by securing a guilty verdict through plea agreement. Respondent claims that the State cannot appeal when it loses at trial and the jury acquits, and that it likewise should not be able to appeal from a guilty plea. Even if the Court disagrees, Respondent asserts the issue is not preserved for appellate review because the State did not make a contemporaneous objection to the plea at the hearing.

We believe, under the specific facts of this case, the State cannot appeal the guilty plea accepted by the trial court. The State is not an "aggrieved party" permitted to appeal under Rule 201(b), SCACR, because it successfully secured a guilty verdict against Respondent through plea agreement. *State v. Cantrell*, 250 S.C. 376, 379, 158 S.E.2d 189, 191 (1967) (noting a guilty plea has the same effect

in law as a verdict of guilty and authorizes the imposition of the punishment prescribed by law); *State v. Cox*, 328 S.C. 371, 373, 492 S.E.2d 399, 400 (Ct. App. 1997) ("[A]n aggrieved party is one who is injured in a legal sense or has suffered an injury to person or property."). Because we hold the State may not appeal under the context presented here, we need not address whether this issue is unpreserved because the State made no contemporaneous objection at the plea hearing, nor whether double jeopardy is implicated. *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (noting an appellate court need not address remaining issues when disposition of a prior issue is dispositive). For these reasons, we dismiss the State's appeal of the guilty plea.[6]

## II.  SENTENCE

We now turn to whether the trial court abused its discretion in sentencing Respondent. The State contends the trial court erred in failing to consider its presentation of facts in sentencing Respondent and instead determining that Respondent was entitled to a presumption of innocence as to those facts. First, the State argues the terms of the plea agreement allowing Respondent to admit guilt to a limited set of *facts* did not establish a limited *indictment*. By considering only Respondent's limited allocution in sentencing, the court sentenced Respondent to the offense as admitted rather than as indicted. Second, the State claims the court committed an error of law by cloaking Respondent with a presumption of innocence as to those facts Respondent did not admit. In its ruling from the bench, the court seemed to indicate it was constitutionally prohibited from considering the State's allegations because they had not been proven beyond a reasonable doubt. The State believes this constituted reversible legal error. We disagree.

Rick Quinn, Jr. was duly convicted of statutory misconduct in office under section 8-1-80, pleading guilty to the indicted offense. *Boykin v. Alabama*, 395 U.S. 238, 242 (1969) ("[A] plea of guilty is more than an admission of conduct; it is a conviction."). *See also Woodard v. State*, 171 So.2d. 462, 469 (Ala. Ct. App. 1965) ("A plea of guilty is more than a voluntary confession made in open court. It also

---

[6] The State also argues the trial court erred in finding a substantial factual basis existed to accept Respondent's guilty plea to statutory misconduct in office when Respondent's limited allocution described only a single ethics violation. Because we find, under these facts, the State cannot appeal the guilty plea, we need not address this issue. *Futch*, 335 S.C. at 613, 518 S.E.2d at 598.

serves as a stipulation that no proof by the prosecution need by [sic] advanced, except as expressly provided by statute . . . . It supplies both evidence and verdict, ending controversy.").

Generally, a sentencing judge has great discretion in the kind of evidence she may use to assist her in determining the punishment to be imposed. *Cantrell*, 250 S.C. at 379, 158 S.E.2d at 191.  Indeed, she is obligated to consider information material to punishment and may "exercise a wide discretion in the sources and types of evidence used to assist [her] in determining the kind and extent of punishment to be imposed within limits fixed by law." *Id*. *State v. Sullivan*, 267 S.C. 610, 618, 230 S.E.2d 621, 625 (1976). *See also Wasman v. United States*, 468 U.S. 559 (1984 ("The sentencing court . . . must be permitted to consider any and all information that reasonably might bear on the proper sentence for a particular defendant . . . ."). Moreover, while the rules of evidence do not apply in sentencing proceedings, the Constitution "require[s] the evidence to be relevant, reliable and trustworthy." *State v. Gulledge*, 326 S.C. 220, 229, 487 S.E.2d. 590, 594 (1997) ("A court may consider any relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided the information has sufficient indicia of reliability to support its probable accuracy.").

Here, the court considered the information provided by the State and Respondent during the December 13, 2017 hearing and sentenced Respondent according to the evidence the court found reliable and relevant.[7]  The court acted within its discretion in its consideration of the entire record and its determination of Respondent's sentence.  Moreover, the court sentenced Respondent to the maximum punishment allowed by law—one-year imprisonment and a $1,000.00 fine.  It was also within the court's power to suspend Respondent's sentence to two years' probation. S.C. CODE ANN. § 24-21-410 (2007); *State v. Thomas*, 372 S.C. 466, 468,

---

[7] Her written order stated: "The Court considered the information provided by the State and the Defendants during the December 13, 2017 hearing and sentenced the Defendants according to the evidence the Court found reliable and relevant."  Thus, regardless of whether the court appeared to apply a presumption of innocence in its ruling from the bench, it did not do so in the order—which is controlling. *Cole Vision Corp. v. Hobbs*, 394 S.C. 144, 149, 714 S.E.2d 537, 540 (2011) ("It is well settled that when there is a discrepancy between an oral ruling of the court and its written order, the written order controls.").

642 S.E.2d 724, 745 (2007) (holding that unless the criminal statute specifically provides that no part of the sentence can be suspended, the power of the sentencing judge to suspend sentence is unlimited). Therefore, the trial court did not abuse its discretion in sentencing Respondent to the maximum permitted by law.[8]

---

[8] We disagree with the concurrence that the trial court was required, as a matter of law, to refuse to sentence Respondent based on all of the evidence presented at the hearing. The State's arguments claiming the trial court committed an error of law stem from the court's oral ruling from the bench, rather than its written order, and seem to have misguided the concurrence's analysis. Instead, viewing the trial court's written order as controlling—as we must do—it is apparent the court, in its discretion, considered the information the State presented at the hearing. *See Hobbs*, 394 S.C. at 149, 714 S.E.2d at 540. As to this finding, the concurrence appears to agree the trial court properly exercised its discretion. It is also clear Respondent pleaded guilty to and was duly convicted of one count of a "continuing offense" of statutory misconduct in office, and the trial court properly considered the evidence which served as the basis for the guilty plea in sentencing Respondent to the maximum allowable punishment. Indeed, at the hearing, the court conducted the plea colloquy as follows:

> THE COURT: And Mr. Quinn, do you wish to plead guilty or not guilty to this charge of misdemeanor failure to register – excuse me, I apologize – misdemeanor statutory misconduct in office, sir?
>
> MR. RICK QUINN, Jr.: Guilty.
>
> THE COURT: All right. Sir, are you pleading guilty because you are in fact guilty?
>
> MR. RICK QUINN, Jr.: Yes, ma'am.

At oral argument, upon questioning by several of the justices, counsel confirmed Respondent did in fact plead guilty to statutory misconduct in office. Accordingly, the trial court correctly convicted and sentenced Respondent based on his confession of guilt. *See* S.C. Code Ann. § 17-23-80 (2014) ("No person indicted for an offense shall be convicted thereof unless *by confession of guilt in open court*, by admitting the truth of the charge against him by his plea or demurrer, by the verdict of a jury accepted and recorded by the court or as provided in Section 17-23-40.") (emphasis

## III.    RECUSAL

Lastly, we consider whether the trial judge's conduct throughout Respondent's guilty plea and sentencing provides sufficient evidence of judicial bias or prejudice to merit her recusal.  The State believes the totality of the trial judge's conduct demonstrates bias such that she should be recused and removed from further involvement in Respondent's case and any other case stemming from the State grand jury investigation.  Specifically, the State contends the court improperly severed the trials of Respondent and his father, conducted *ex parte* communications without the State's consent, failed to inform it of the substance of those communications, and imposed a lighter sentence than requested after improperly applying a presumption of innocence to the State's evidence.  Further, the State believes that comments made on Facebook by the court reporter provide evidence of the judge's partiality, speculating the comments must have resulted from conversations in chambers.  We disagree.

When the moving party has failed to demonstrate some evidence of judicial bias or prejudice, an appellate court will not reverse a judge's decision not to recuse. *Davis v. Parkview Apartments*, 409 S.C. 266, 284, 762 S.E.2d 535, 545 (2014). Here, the State's claim for the court's recusal is specious and wholly without merit, as it has failed to show any evidence of judicial bias or prejudice. *Roche v. Young Bros. of Florence*, 332 S.C. 75, 84-85, 504 S.E.2d 311, 316 (1998) (noting a judge should recuse himself when his impartiality "might reasonably be questioned"). There is absolutely no evidence in the record to support the State's claim that *ex parte* communications took place between the court and Respondent's counsel without its consent.  Further, the State's claims involving the court reporter and the court's alleged use of the presumption of innocence fail to prove the judge was partial, biased, or prejudiced against the State in any way.  Therefore, the court's decision not to recuse is affirmed.

## CONCLUSION

For the foregoing reasons, we conclude that under these facts, the State cannot appeal the guilty plea, the trial court did not abuse its discretion in sentencing Rick Quinn, Jr., and there is no evidence of judicial bias or prejudice requiring the court

---

added).  Moreover, we decline to address the issue of the State's corporate integrity agreements, as it has no bearing on the resolution of this case, and we express no opinion as to the propriety of these agreements at this time.

to recuse itself.  Therefore, we **DISMISS** the State's appeal of the guilty plea and **AFFIRM** the trial court's order as to the sentence and recusal issues.

**BEATTY, C.J.,  KITTREDGE and JAMES, JJ., concur.  FEW, J. concurring in a separate opinion.**

**JUSTICE FEW:** I agree with the majority to dismiss the State's appeal of Quinn's guilty plea, affirm his sentence, and affirm the trial court's refusal to recuse herself. I write separately primarily to address the actions of the State's representative.

I first address a relatively minor point of disagreement with the majority. The State accused Rick Quinn of extremely serious political corruption. Among many charges, the State accused Quinn of selling his vote on important issues before the House of Representatives in exchange for over $4 million in bribes to Quinn's affiliated companies. In his guilty plea, however, Quinn admitted only that he did not report on his ethics disclosure form that the University of South Carolina (USC) paid one of Quinn's companies $30,000 in rent. The State is not complaining that the trial court failed to consider all of the information the State presented at the sentencing hearing, including the allegations of accepting bribes. If that were the State's complaint, I would eagerly join the majority in finding the trial court properly exercised its discretion. The State contends, rather, the trial court committed an error of law.[9] The State contends, "Even though [Quinn's criminal] conduct spanned a number of years and violated numerous statutory provisions, the State made a prosecutive[10] decision that this conduct was committed for the singular

---

[9] The State argues "the [trial] court held it could not consider those acts because [Quinn] was innocent until proven guilty, which is clearly an error of law." Appellant Br. 25. "This Court should hold"—the State continues—"[Quinn's] guilty plea encompassed all conduct that forms the basis of the indictment, and that the plea court committed an error of law." *Id.*; *see also id.* at 29 ("The [trial] court committed an error of law . . . ."); *id.* at 32 ("By determining that [Quinn] was 'innocent until and unless he is proven guilty' . . . , the [trial] court committed a reversible error of law.").

[10] In this context, the State used "prosecutive" to mean "strategic." In other contexts, "prosecutive" means whether or not to prosecute. *See, e.g.*, *Pascoe v. Wilson*, 416 S.C. 628, 632, 788 S.E.2d 686, 688 (2016) ("McIntosh wrote a letter to the Chief of the South Carolina Law Enforcement Division . . . asking he forward the SLED report resulting from the investigation into the redacted legislators to Pascoe 'for a prosecutive decision.'").

purpose of using [his] position as a member of the House of Representatives for the financial benefit of himself and his family." Appellant Br. 26. That is a valid point in relation to framing an indictment. However, the State's contention—that because both accepting bribes and failing to report may be labelled as misconduct in office they must be treated as one crime for purposes of sentencing—is a ruse. The trial court was legally correct not to fall for it. I would hold—as a matter of law—the trial court properly refused to sentence Quinn for committing the crime of accepting bribes because the only crime Quinn admitted committing was not reporting rental income.

Turning to my primary reason for writing separately, I believe the root of the State's arguments on appeal—the trial court erred in accepting the plea, erred in refusing to sentence Quinn as the State wished, and erred in refusing to recuse herself when the State did not get its way—is that the trial court treated the State unfairly. While I completely agree with the majority's rejection of these arguments, the "unfairness" aspect—in my judgment—warrants further discussion.

The State complains of unfair treatment in numerous respects. As an example, it complains the trial court treated the State unfairly regarding a joint trial, stating, "Proceeding without any motion or without any severance hearing, the court scheduled only [Quinn's] trial for February 26, 2018, granting a non-existent motion to sever without affording the State an opportunity to argue against the severance." Appellant Br. 10. In a footnote to this text, the State complains,

> While the court indicated she would allow [the State] to make a record opposing the severance, the court never actually stopped to permit counsel a chance to respond. Indeed, the State contends that the grounds offered by the court for severing the cases was improper but did not have the chance to make the argument.

*Id.* at 10 n.2.

The State also complains it was treated unfairly because it did not have an adequate opportunity to challenge the limited set of facts Quinn was willing to admit. The State noted in its brief that the trial court "incredibly never allowed

the State an opportunity to place its objections or concerns on the record" and "the State was not permitted to object to the validity of the guilty plea during the sentencing hearing." Appellant Br. 7-8. Thus, the State complains, the trial court "denied the State its due process right to be heard."[11] Finally, the prosecutor complained to the trial court it was unfairly prohibited from taking Quinn to trial because of a lack of funding, stating, "I have not gotten a dime of money from the State for this case."

To understand the significance of the "unfairness" argument to this appeal, some history of this investigation is useful. As this Court explained in *Pascoe v. Wilson*, 416 S.C. 628, 788 S.E.2d 686 (2016), the Attorney General in 2014 appointed David M. Pascoe Jr.—the elected Solicitor of the First Judicial Circuit, comprising Calhoun, Dorchester, and Orangeburg Counties—as a "designated prosecutor" to investigate Bobby Harrell, former Speaker of the House of Representatives. 416 S.C. at 631, 788 S.E.2d at 688. As Pascoe described the investigation in his brief in this case, "In the course of investigating Mr. Harrell's conduct, SLED uncovered potentially criminal conduct by . . . other state legislators," including Quinn. Appellant Br. 9. These "other state legislators" are the "redacted legislators" this Court referred to in *Pascoe v. Wilson*. *See* 416 S.C. at 631, 788 S.E.2d at 688 ("A SLED report generated during the Harrell investigation contained the redacted names of certain legislators (the 'redacted legislators'), who were allegedly implicated in unethical and illegal conduct.").

Pascoe explained how the investigation developed,

---

[11] I agree the State should be given an opportunity to be heard. However, the State is not protected by the Due Process Clause. "The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court." *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24, 86 S. Ct. 803, 816, 15 L. Ed. 2d 769, 784 (1966). If the Fifth Amendment does not protect the State from the federal government, the Fourteenth Amendment certainly does not protect one arm of the State (prosecutors) from another arm (courts).

> This investigation initially focused on [Quinn's] practice of using his office as House Majority Leader and leader of the House Republican Caucus to channel caucus mailing and political services to a network of Quinn family businesses, thus using his official position to gain an economic advantage. However, as the investigation examined the Quinn businesses more closely, a complex scheme of cash-for-influence political "consulting" was revealed . . . . Investigation of the Quinns' businesses involved analysis of voluminous bank records, emails, and witness testimony, culminating in the indictment of [Quinn] and his father.

Appellant Br. 9.

Based on this investigation, Pascoe brought the criminal charges in this case. He made a strategic decision to frame the indictment against Quinn as one count instead of listing the separate criminal acts as individual counts. At the December 13, 2017 sentencing hearing, Pascoe described the theory behind his strategy. He began by generally describing how bad things are "up there in Columbia." He then told the judge, "There's been no one more corrupt than Rick Quinn in Columbia, South Carolina, and no entity more corrupt than Richard Quinn & Associates."

The trial court pushed back. Puzzled that Pascoe would dismiss the most serious charges against someone so "corrupt" as Quinn, and permit him to plead guilty to a relatively minor charge, the judge pressed Pascoe for an explanation.

> I need you to explain to me . . . why are you, if the evidence is as damning, in your words, and extensive against Rick Quinn and Richard Quinn, . . . why are you allowing them to plead guilty to - - ; Richard Quinn pleading guilty, and not even he's pleading guilty, the corporation is pleading guilty. There's no personal liability as to Richard Quinn. As to Rick Quinn, one count, the misdemeanor misconduct in office. I mean, why have you dismissed all the charges after four years?

Pascoe's explanation included the excuse that as Solicitor of the First Circuit he did not have funds in his budget to pay for what he said could be a ten-week trial.  Pascoe stated to the trial court,

> I never let money -- I try never to let money get in the way of an investigation.  Our office has already spent hundreds of thousands of dollars. . . .  I don't know if you know this.  I have not gotten a dime of money from the State for this case.
>
> And my office has a budget of three million dollars.  Can you imagine what $500,000 would do?  So that's a sixth of my budget.  Those were factors as to why we considered this plea.

This Court pushed back on that.  At oral argument before us on October 15, 2019, a Justice pressed Pascoe for an explanation.

> You want to go back and try this case, right, even though you said on the record to Judge Mullen in response to her question to you . . . at the end of your PowerPoint, "Why, . . . if you have all this damning evidence, why aren't you going forward . . . ?"
>
> What you relied on . . . was how expensive this trial would be. How it would exceed your budget, but you're not worried about that now?

Pascoe responded,

> I have money now.  As you, your Honor knows, from the -- it's sitting in escrow.  So cost is not a problem.  My office isn't going to go bankrupt if I have more cases to try.

No, actually, we did not know.  At the time of oral argument, there was nothing in this record that indicated Pascoe now somehow has money to prosecute this and other cases.  Subsequently, however, we learned Pascoe obtained $352,000 by entering into what he calls a "corporate integrity agreement" with at least five different corporate and governmental entities.

Having learned that—on March 12, 2020—this Court unanimously ordered that the case be reargued. In the order, we stated,

> In light of new information discovered at oral argument regarding the State's corporate integrity agreements providing funding for prosecutions stemming from the public corruption probe, we now order the appeal to be reargued on April 8 . . . to address the propriety of these agreements.
>
> Accordingly, leave shall be granted to the parties to supplement the record. . . . [T]he State shall file with the Clerk of this Court a memorandum addressing the following:
>
> 1. What is the nature of the "corporate integrity agreements" referenced at oral argument?
>
> 2. What is the authority under South Carolina law of any representative of the State, including Solicitor Pascoe, to enter into a "corporate integrity agreement" in either a criminal or civil proceeding in exchange for a promise not to sue, and to demand or accept the payment of funds from a corporate or governmental entity or from an individual during the course of a criminal investigation?
>
> 3. Does Solicitor Pascoe have the authority to "direct" the expenditure of funds received pursuant to a "corporate integrity agreement" to the First Circuit Solicitor's Office, or must the funds be deposited in the State's general fund? The State shall specifically address S.C. Code Ann. § 1-7-150(B) (2005); S.C. Code Ann. § 1-7-360 (2005); and S.C. Code Ann. § 39-3-180 (1976). Immediately upon the filing of its memorandum, the State shall serve a copy upon opposing counsel and upon the Attorney General (or his designee). Within ten days of the filing of the State's memorandum, Respondent and the Attorney General (or his designee) may file a responsive memorandum.

Pascoe and the Attorney General filed their memoranda as directed, but the Court has now determined that because of the current pandemic we will go ahead and resolve this appeal without rearguing the case. Despite our receipt of the memoranda, however, we still do not know what is a "corporate integrity agreement," nor what authority exists under South Carolina law to enter into such an agreement. The term has never been used by any appellate court in this State, and the term is not used in any South Carolina statute.[12] The only legal authority Pascoe cites in his memorandum is his "unfettered discretion" as a prosecutor. Appellant's Mem. in Resp. to Ct.'s Inquiry 3. The Attorney General contends there is no authority, citing several reasons. The Attorney General wrote,

> The "corporate integrity agreements" are unprecedented and without parallel in South Carolina. Not only were these agreements, executed by the special prosecutor, far in excess of the jurisdiction given him by this Court in *Pascoe v. Wilson*, but the agreements were not authorized by South Carolina law – either

---

[12] The term has been used under federal law to describe a completely different thing—a settlement agreement arising out of *civil* litigation through which health care providers *pay no money*, but agree to take certain steps within their organization to ensure future compliance with the law, in exchange for which the Office of Inspector General for the United States Department of Health and Human Services agrees not to seek their exclusion from participation in Medicare, Medicaid, or other Federal health care programs. *See* OFFICE OF INSPECTOR GEN., CORPORATE INTEGRITY AGREEMENTS, https://oig.hhs.gov/compliance/corporate-integrity-agreements/index.asp; *see also Pub. Citizen v. United States Dep't of Health & Human Servs.*, 66 F. Supp. 3d 196, 200 n.1 (D.D.C. 2014) ("[Corporate integrity agreements] are part of settlement agreements . . . with companies seeking to resolve civil and administrative health care fraud cases and avoid costly exclusion from participation in Federal health care programs. In return for these benefits, . . . the companies must agree to enhanced compliance measures, subject to auditing by an outside independent party and monitoring by the [Office of Inspector General]." (citations and internal quotations omitted)).

statute, rule of court, or judicial decision.  Their existence is based only upon "prosecutorial discretion" – which is not enough.  The rule of law must prevail.

Att'y General's Mem. in Resp. to Ct.'s Order 2-3.

Pascoe uses the term "corporate integrity agreement" to mean the payment of money to Pascoe's First Circuit Solicitor's Office by entities he has under investigation in exchange for a promise by Pascoe not to prosecute the entity, so Pascoe then has funds to prosecute entities or persons who either were not invited to pay or refused to pay.  Pascoe entered these "agreements" with SCANA, Palmetto Health, AT&T, USC, and the South Carolina Association for Justice, each of which was under investigation by the State Grand Jury.  According to the grand jury's report, at the time Pascoe entered into each agreement, the grand jury already determined probable cause existed that each entity willfully violated subsection 2-17-25(A) of the Lobbyists and Lobbying Act (2005).  *See* Report of the 28th State Grand Jury (June 21, 2018) at 19, 22, 24, 27, 29.

In my dissenting opinion in *Pascoe v. Wilson*, I argued article V, section 24 of our state constitution provided the Attorney General with the authority to remove an appointed prosecutor from a case, "even one to whom he had previously given complete discretion for the prosecution," 416 S.C. at 648, 788 S.E.2d at 697 (Few, J., dissenting), unless the presiding judge finds "an actual conflict of interest on the part of the Attorney General," 416 S.C. at 647, 788 S.E.2d at 697 (Few, J., dissenting).  It is clear that the result of the majority's decision in *Pascoe v. Wilson* led us directly to the problems we now face in this case.[13]  Pascoe's prosecution of Quinn, Richard Quinn Sr., the other "redacted legislators," and we do not know whom else, is no longer subject to any supervision.  The Attorney General has been removed from his constitutional role, and the First Circuit voters—who elected Pascoe as

---

[13] I also wrote, "In all likelihood, the result" of disqualifying the Attorney General "would be the same" even under my proposal.  416 S.C. at 648, 788 S.E.2d at 697 (Few, J., dissenting).  However, following the procedure I argued was required by law would have left the presiding judge of the State Grand Jury with at least some responsibility or supervision.

Solicitor—are not likely to be concerned with actions he takes outside the circuit with money he did not get from taxes they paid.

As an unsupervised prosecutor, free from any oversight or control by the Attorney General or the First Circuit voters, Pascoe has created a "prosecutive" mess. On one hand, by his own description, Pascoe allowed the most corrupt politician in Columbia (Quinn) and the most corrupt entity in politics (Richard Quinn & Associates) to go essentially scot free. On the other hand, Pascoe accepted hundreds of thousands of dollars from major South Carolina corporations on the promise not to prosecute them for conduct the State Grand Jury found probable cause to believe is criminal. These and other concerns demonstrate the risks and dangers article V, section 24 was designed to protect against.

While the propriety of allowing Quinn to plead guilty and avoid the most significant charges against him is beyond the review of this Court, the "corporate integrity agreements" are not. As the majority in this case indicates, this Court now plans to address the propriety, legality, and validity of the agreements in our upcoming oral arguments in *State v. Harrison*.