682 S.E.2d 275

**The STATE, Respondent,**

·v.

**Jonothan C. VICK, Appellant.**

**No. 4573.**

Court of Appeals of South Carolina.

Heard March 17, 2009.

Decided June 25, 2009.

Rehearing Denied Sept. 17, 2009.

190

Robert M. Dudek, Deputy Chief Appellate Defender for Capital Appeals, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Melody J. Brown, all of Columbia; and Solicitor Harold W. Gowdy, III, of Spartanburg, for Respondent.

HUFF, J.:

Appellant Jonothan C. Vick was indicted for and convicted of murder, first-degree criminal sexual conduct (CSC), and kidnapping. The trial judge sentenced Vick to life imprisonment for murder and thirty years each for CSC and kidnapping. Vick appeals, arguing (1) the trial court erred in allowing hearsay testimony from a witness regarding a telephone conversation between the victim and appellant's mother and (2) his kidnapping sentence should be vacated pursuant to South Carolina Code Ann. § 16-3-910. We affirm in part and vacate in part.

## FACTUAL/PROCEDURAL HISTORY

This case involves the murder of Dana (hereinafter Victim), a twenty-seven year old mother of two who was found brutally beaten and strangled on July 31, 1995 inside the beauty salon she owned. Patty Taylor testified she arrived at Victim's salon at 6:30 in the evening on July 31, 1995 for a hair appointment. After she arrived, a woman selling a cleaning product made a demonstration to her and Victim, and Victim purchased a bottle of the item from the woman. Thereafter, Victim began working on Taylor's hair a little before 7:00 and finished around 8:00. During this time, Victim also swept and cleaned her shop. After Taylor paid her, Victim walked Taylor to the door. Victim told Taylor she had some clothes in the dryer, and when Taylor offered to stay with her until she locked up the shop, Victim declined, stating she would be right behind her as she only had five minutes left for the clothes. Taylor estimated she left the shop at 8:10 or 8:15.

Witness Diane Harris, who lived in Charlotte, was in the area of the beauty salon on the day of Victim's death, selling an all purpose cleaning product door-to-door. Harris went to Victim's salon around 6:30 or 6:40 and, after giving Victim a demonstration of her product, completed a sale with Victim around 6:50. Harris was scheduled to meet back at a designated spot at 8:30 and was to be the last salesperson picked up before travelling back to Charlotte. After leaving Victim's shop, Harris walked around the area making calls on different houses. Around 8:10, she walked back through the parking lot of Victim's salon at which time she saw Victim through the window of the salon and spoke to Victim. Victim appeared to be cleaning and waved at Harris. Harris continued on her quest to sell her product and headed back to her pick-up spot at 8:30. As she reached the parking lot of the salon, she noticed the lights were on in the salon, but the window blinds were now down. At that time, she heard thumping sounds. When she looked around, she observed a man coming out of the salon window. Startled, Harris ran, leaving all her belongings behind. As she ran around the building in one direction, the man ran in the other, and the two came face to face on the other side of the building. Harris then ran out to the street and screamed. She ran into a home, locked the door, and told the residents to call 9–1–1, screaming that

Victim needed help. Harris testified the man she saw coming out of the window and again at the back of the building "was white and looked crazy." He was wearing a gray or white t-shirt and a pair of blue jeans, and appeared to be between twenty and thirty years-old.

Another witness observed a woman and man in the area of the salon fitting the description of Harris and the man Harris described encountering that night. Around 8:30 in the evening on July 31, 1995, Michael Crook was driving towards Spartanburg when he observed a black woman walking and then saw a white male, who was bent down and was looking back toward Victim's salon. The man was wearing "grayish colored blue jeans and a grayish colored t-shirt."

Additionally, witness Jerry Mills testified he was familiar with Victim's salon, which was located in the same area as his place of employment. Mills stated that he drove by the area around 5:00 or 5:30 on the afternoon of July 31, 1995 and did not notice anything out of the ordinary. However, just before dusk as he drove back through, he observed a Ford Bronco parked in a place where his employer did not allow parking. None of Mills' co-employees drove a vehicle like that. Mills pulled up closer to the car to investigate further but found no one around the vehicle. He described the Bronco as a late 1980's car, blue with a white or light cream colored top, and with "nice rims" on the tires that did not look like factory rims, and may have been called razor rims.

Spartanburg County Sheriff's Deputy John Todd Burnett received a call reporting a breaking and entering on July 31, 1995 at approximately 8:45 or 8:50 p.m., and arrived on the scene at Roebuck Beauty and Tanning Salon shortly before 9:00. Deputy Burnett found the only door to the establishment partially cracked and a screen from a window on the ground, with the window open. Inside, the deputy discovered the body of a twenty-seven year-old female in a bathroom/washroom. Victim was hanging from a strap around her neck which was connected to a hot water heater. She had blood in her hair and on her face, she had cuts and bruises on her face, and her tongue appeared to protrude from her mouth. A white t-shirt on the top of her body was covered

with blood, and she was nude from the top portion of her waist down, with her pants on her left ankle.

Investigation of the scene revealed all of the blood was contained to the bathroom area where Victim was found. This room showed evidence a struggle had taken place therein. Victim's pocketbook, wallet, and checkbook were discovered in the salon, as well as the business cashbox and checkbook. The wallet and cashbox together contained over $200 in cash.

The pathologist who performed an autopsy on Victim noted she had a deep abrasion on her forehead as well as other superficial abrasions and numerous contusions about her head, neck, upper chest, elbows, arm, wrist, knees, and ankle. Victim's hyoid bone appeared fractured, indicating considerable pressure had been applied. This usually occurs from manual strangulation but could have been caused by a ligature. The pathologist believed Victim was probably strangled manually, as well as with the use of a ligature. Examination of Victim's brain also revealed extensive hemorrhaging caused by blunt force trauma.

David Michael Pace testified that he became a friend of appellant Vick in 1994 when they were in high school. Pace worked at a bowling alley and Vick would come by the place of business about twice a month, usually on Friday or Saturday nights. The last time Vick visited Pace at the bowling alley was on a Monday evening at the end of July in 1995. At that time, Vick was wearing blue jeans and a light colored shirt. Vick talked to Pace about a lady named Dana, and the fact that he was going to ask her out that night. Vick had previously spoken about Dana to Pace on a couple of occasions, telling Pace that Dana was a hairdresser who cut his hair and complimenting Dana's looks. On that Monday night at the end of July, Vick told Pace that Dana was having problems with her husband and he was going to ask Dana out and hoped she would agree to date him. Pace laughed at the idea because Dana was an older woman and he thought Vick was too young for her. Vick then became defensive and angry at Pace's reaction, stating he believed he had a chance with her. Vick stated that he hoped Dana would say yes to his date proposal, and graphically described to Pace how he would "bend her over her barber chair" and perform sexual acts on

her. He further stated other sexual conduct he would like to have take place with Dana.

After talking for close to an hour, Vick agreed to give Pace a ride home. During the drive, Vick, who was very serious about his intentions with Dana, "kept defending himself" and was upset that Pace had laughed at him. Vick dropped Pace off around 6:45 or 7:00 p.m. As Pace exited the vehicle, Vick told him he was going to get his hair cut. When Pace asked who would cut his hair that late at night, Vick responded that Dana kept her salon open late at night and she knew he was coming. Pace described the vehicle Vick drove that night as a blue and white Ford Bronco with distinctive saw blade wheels.

The next time Pace saw Vick was a few days later at a pool hall. Pace stated Vick walked up and "bumped into [him] in a serious manner." Vick then told Pace "if I tell anybody he would kill me." When Pace asked what he was talking about, Vick said that Pace knew, or he would find out. A couple of days to weeks after the incident at the pool hall, Pace realized what Vick did not want him to discuss when he saw a report on the news that described a vehicle similar to Vick's and showed a sketch that closely resembled Vick.[1] Approximately three months after the murder, Pace anonymously provided authorities the name of a possible suspect. Pace contacted law enforcement a second time after the murder was featured on a television program, again remaining anonymous. On a third occasion, during an unrelated incident at the bowling alley, Pace informed an officer he might know who was responsible for Victim's murder and gave the officer a name, but he still did not give the officer his own name. Finally, in 2005 Pace had someone again contact law enforcement on his behalf. Eventually he came forward and informed the authorities of the information he relayed to the jury.

SLED Agent Lilly Gallman, an expert in the area of DNA and serology, testified she processed the crime scene for body fluids. When she examined Victim's body with an illumilight she noted it fluoresced, indicating possible semen in Victim's pubic hairs. Remembering what she had observed at the time she processed the scene, Agent Gallman later tested evidence

---

1. Pace stated that after watching the news report, he knew it was July 31 when he had talked with Vick at the bowling alley.

from Victim's rape kit, which contained pubic hair combings, hoping to find semen. The sample tested positive for semen, and Gallman was later able to develop a profile from it. Agent Gallman received a sample of Vick's DNA in 2005 and found his DNA profile matched the DNA profile developed from the semen. She testified the probability of randomly selecting an unrelated individual having a DNA profile matching the semen was approximately one in 900 million.

The State also presented evidence that in 1996, Aaron Popkin purchased a 1988 blue and white Ford Bronco with saw blade wheels owned by Vick's family. Popkin testified he met with Vick at his place of employment after seeing an ad for the car. When Popkin offered to loan Vick one of his cars while his mechanic kept the Bronco for inspection, Vick indicated to Popkin that he was suspicious Popkin may actually be a police officer. The two then worked out an alternate arrangement for inspection of the car.

The State further presented the testimony of one of Vick's cellmates at the local county detention center. Steve Vaughn was housed in a cell with Vick for approximately eight or nine weeks starting in February 2006. Vaughn testified that he and Vick discussed their pending charges during this time. On one particular night, Vaughn recalled he had a "bad phone call" from his wife and was upset. In discussing the call with Vick, Vaughn asked him whether there was anything in his life or a day in his life he would take back if he could. Vick responded it would be the day he went over to Victim's shop. Vick told Vaughn he drove his vehicle over there, but parked across the road because Victim was married and he did not want her husband to see him or his vehicle. He further indicated he exited the building through the window because he was scared. Vick indicated he recalled having a conversation with Victim, but he "blacked out" and did not recall anything else while in the shop.

The jury found Vick guilty of murder, kidnapping, and first-degree CSC. The court sentenced Vick to life imprisonment for murder, thirty years for the CSC charge, and thirty years for kidnapping. This appeal follows.

## ISSUES

1. Did the trial court err by allowing the testimony from a witness that while Victim was doing her hair at the salon Vick's mother telephoned Victim and asked Victim to fix Vick's hair, Victim related to the witness her exasperation about the situation, and Victim told the witness she would not accommodate Vick, as the testimony amounted to prejudicial hearsay since the State's theory was that Vick sexually assaulted and killed Victim at the beauty shop at some time not far removed from the phone call?

2. Should Vick's thirty year sentence for kidnapping be vacated pursuant to S.C.Code Ann. § 16–3–910 since he was also sentenced for murder?

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only. We are bound by the trial court's factual findings unless they are clearly erroneous. This same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases." *State v. Wilson,* 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001) (citations omitted).

## LAW/ANALYSIS

Vick first contends the trial court committed reversible error in allowing the testimony of Darlene Reeves regarding a telephone conversation she heard between Vick's mother and Victim almost one week prior to Victim's murder. We disagree.

The record reveals the State called Reeves to the stand and questioned her about a telephone conversation she overheard between Victim and Vick's mother, and the related conversation between Victim and Reeves after the call ended. Reeves testified that she was a customer and a friend of Victim, and that she was in Victim's salon around Tuesday, July 25, 1995 to have her hair cut. While Reeves was in the chair, Victim received a call from Vick's mother, Mary Ann. Reeves, who was acquainted with Mary Ann Vick and had talked to her on the telephone before, knew it was Mary Ann on the phone

because Victim was behind Reeves when the phone call came, and she recognized Mary Ann's voice. When Reeves was asked why Mary Ann was calling, defense counsel objected on the basis of speculation and hearsay. The trial court overruled the objection and Reeves then testified as follows:

She wanted [Victim] to look at [Vick's] hair that, you know, I don't know if he put something on it or had someone. But she told her that it wouldn't take but about ten minutes of her time. And Mary Ann could not, excuse me, [Victim] could not do it that day and had stated to Mary Ann that she was not able to do it but if she would call her back, you know, it's been a timeframe, so I don't know if she said come by there the next day or call her back.

Counsel again objected, asserting anything Victim said in the phone conversation was hearsay. The court again overruled the objection, but instructed the witness to testify only to matters that she remembered. When asked what she remembered about the conversation, Reeves stated "[t]he conversation was to call back and she would take a look at it but she could not do it that day." Reeves went on to state, "I just heard the voice. And when [Victim] hung up she—obviously Mary Ann hung up on her because there was no good-bye. And Victim turned around to me and she just, she took a breath and she said Mary Ann Vick." Counsel again objected on the basis of hearsay, at which time a bench conference was held off the record. The Solicitor then asked Reeves what Victim told Reeves after the phone call ended. Reeves stated that Victim told her that it was Mary Ann Vick, at which point Reeves told Victim she knew because she recognized the voice. When Victim asked if Reeves knew them, Reeves told her that she did. Reeves then testified as follows:

[Victim] said to me, she said, well, I won't do that anymore. She said that the last time that he was here that was the case, that ten minutes of your time and it took her an hour and a half. She did not have time to do it that day.

Defense counsel objected "to that last statement," but was overruled without comment.

Vick maintains this testimony related in detail the substance of what Victim told Reeves about the conversation and the situation with Vick. He argues the purpose of the testimony

elicited by the State was to impart to the jury that Victim's past dealings with Vick were unpleasant, she was unhappy with Vick and his mother, and that she was not looking forward to dealing with Vick again. Accordingly, Vick argues Reeves' testimony, coupled with Pace's testimony of Vick's anger when Pace mocked him about his intention to date Victim, led to the inference of a strong rebuff by Victim of any advance by Vick and a resulting angry response by Vick. He contends this testimony was hearsay and it was highly prejudicial.

■ Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. The rule against hearsay prohibits the admission of evidence of an out of court statement by someone other than the person testifying which is used to prove the truth of the matter asserted. *Watson v. State*, 370 S.C. 68, 71, 634 S.E.2d 642, 644 (2006); *Rhodes v. State*, 349 S.C. 25, 31, 561 S.E.2d 606, 609 (2002). It is well settled that evidence is not hearsay unless offered to prove the truth of the matter asserted. *State v. Brown*, 317 S.C. 55, 63, 451 S.E.2d 888, 894 (1994); *State v. Smith*, 309 S.C. 442, 447, 424 S.E.2d 496, 499 (1992); *State v. Sims*, 304 S.C. 409, 420, 405 S.E.2d 377, 383 (1991); *State v. Green*, 318 S.C. 426, 429, 458 S.E.2d 73, 75 (Ct.App.1995).

■ Further, the improper admission of hearsay testimony constitutes reversible error only when the admission causes prejudice. *State v. Weston*, 367 S.C. 279, 288, 625 S.E.2d 641, 646 (2006); *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 150–51 (1985). Error is harmless when it could not reasonably have affected the result of the trial. *Mitchell*, 286 S.C. at 573, 336 S.E.2d at 151. Appellate courts will not set aside convictions due to insubstantial errors not affecting the result. *State v. Sherard*, 303 S.C. 172, 176, 399 S.E.2d 595, 597 (1991). An insubstantial error not affecting the result of the trial is harmless where guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached. *State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989). Additionally, the admission of improper hearsay evidence is harmless where the evidence is merely cumulative

to other evidence. *State v. Price,* 368 S.C. 494, 499, 629 S.E.2d 363, 366 (2006).

Here, the evidence objected to by Vick obviously was not offered for the truth of the matter asserted and therefore, by definition, is not hearsay. As noted by the State, the conversation simply related that Victim did not have time to fix Vick's hair at the request of Vick's mother. Clearly, this evidence was not offered for the truth of the matter asserted, i.e. that Victim did not have time to work on Vick's hair that day. If the evidence was elicited, as Vick contends, to show that Victim's past dealings with Vick were unpleasant, she was unhappy with Vick and his mother, and that she was not looking forward to dealing with Vick again, it was not then elicited to show the truth of the matter asserted, that Victim did not have time to fix Vick's hair on that particular day.

 Further, even if the evidence was improperly admitted hearsay, Vick has failed to demonstrate reversible error. If the logical relevance of the evidence is, as submitted by the State, to show Victim knew Vick and he was one of her customers, Reeves' testimony was merely cumulative to other unobjected to testimony that Vick was a customer. More importantly, however, a review of the record shows the jury's verdict was based on an abundance of competent evidence from which Vicks' guilt was conclusively proven such that any error in admission of the evidence would be harmless. Testimony submitted at trial shows: (1) Vick had a sexual desire to be with Victim and intended to visit her at the salon on the night of her murder, and Vick threatened to kill the witness who could provide this information, (2) a person matching the description of Vick was seen exiting Victim's salon just before Victim's brutally beaten, semi-nude body was discovered in the salon, (3) a car very similar to Vick's in make, model, color and with distinctive rims was seen parked in the area around the time of the murder, (4) Vick confided in a cellmate that he wished he could take back the day he went over to Victim's shop, that he drove his vehicle over there, parking across the road so as not to be seen, and though he blacked out while inside the salon, he recalled exiting the building through the window because he was scared, and (5) Vick's DNA matched the semen left on Victim's body and the probability of randomly selecting an unrelated individual having a DNA profile

matching the semen was approximately one in 900 million. Accordingly, the admission of Reeves' testimony was insubstantial and could not have affected the result of the trial and therefore, if in error, was harmless.

Vick next contends his thirty-year kidnapping sentence should be vacated inasmuch as he was sentenced for murder and the kidnapping sentence was therefore improper pursuant to S.C.Code Ann. § 16–3–910. We agree.

The State acknowledges it is error to sentence a defendant for the kidnapping of a victim whom he is also convicted of murdering, and that when a defendant is convicted of murder, any sentence for kidnapping of the victim should be vacated. However, the State maintains Vick failed to object to the sentence when imposed, and the law requires a challenge to sentencing must be raised at trial in order to be preserved for appellate review. Accordingly, the State maintains, though the kidnapping sentence was error and likely will be addressed in a separate proceeding, the issue is procedurally barred from review and may not be addressed in a direct appeal before this court.

Section 16–3–910 of the South Carolina Code provides as follows:

Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law, except when a minor is seized or taken by his parent, is guilty of a felony and, upon conviction, must be imprisoned for a period not to exceed thirty years *unless sentenced for murder as provided in Section 16–3–20.*

S.C.Code Ann. § 16–3–910 (2003) (emphasis added). Our courts have long held, where an appellant has been sentenced for murder of a victim, this code section precludes a sentence for kidnapping of that victim, and any such sentence should be vacated. *Owens v. State,* 331 S.C. 582, 584–85, 503 S.E.2d 462, 463 (1998); *State v. McCall,* 304 S.C. 465, 470, 405 S.E.2d 414, 416–17 (Ct.App.1991), *overruled on other grounds by Brightman v. State,* 336 S.C. 348, 352, 520 S.E.2d 614, 616 (1999); *State v. Livingston,* 282 S.C. 1, 8, 317 S.E.2d 129, 133 (1984); *State v. Perry,* 278 S.C. 490, 495, 299 S.E.2d 324, 327 (1983);

*State v. Copeland,* 278 S.C. 572, 597, 300 S.E.2d 63, 77–78 (1982).

The State correctly notes that our courts have held a challenge to sentencing must be raised at trial to be preserved for appellate review. *See State v. Johnston,* 333 S.C. 459, 462, 510 S.E.2d 423, 425 (1999) (noting our supreme court "has consistently held that a challenge to sentencing must be raised at trial, or the issue will not be preserved for appellate review"). However, the State concedes that it is error to sentence a defendant for the kidnapping of a victim whom he is also convicted of murdering, and any such sentence for kidnapping should be vacated. The State further recognizes that the issue, if determined to be unreviewable on direct appeal, will in all likelihood be addressed in a post-conviction relief proceeding. In *Johnston,* the court noted that case presented an exceptional circumstance wherein the State conceded that the trial court committed error by imposing an excessive sentence. The State nevertheless maintained that appellant's appropriate remedy was through the Post Conviction Relief Act. The *Johnston* court recognized that if it unyieldingly enforced PCR as the only avenue of relief, there was a real threat that appellant would remain incarcerated beyond the legal sentence due to the additional time it would take to pursue such a remedy. Accordingly, the court determined that exceptional circumstances warranted a remand for resentencing. *Id.* at 463–64, 510 S.E.2d at 425.

While the case at hand does not present a threat that Vick will remain incarcerated beyond the legal sentence as in *Johnston,* our courts have, in the past, "summarily vacated" sentences for kidnapping where such sentences were precluded by § 16–3–910 because the defendant received a concurrent sentence under the murder statute. *See Owens,* 331 S.C. at 585, 503 S.E.2d at 463; *McCall,* 304 S.C. at 470, 405 S.E.2d at 417 (noting the appellate courts have "summarily vacated" sentences for kidnapping when the defendant received a concurrent sentence under the murder statute). Additionally, our courts have at times considered an issue in the interest of judicial economy. *See S. Bell Tel. & Tel. Co. v. Hamm,* 306 S.C. 70, 75, 409 S.E.2d 775, 778 (1991) (holding, where a party argued that the trial court erred in rendering judgment on a constitutional issue inasmuch as such an analysis was "purely

advisory," because the issue would be raised to the court at some future time and since both parties had fully briefed the issue, it was proper for the appellate court to decide the matter in the interest of judicial economy); *Jeter v. S.C. Dep't of Transp.*, 369 S.C. 433, 441 n. 6, 633 S.E.2d 143, 147 n. 6 (2006) (holding, regardless of any preservation problems, the appellate court would address an issue in the interest of judicial economy).

## CONCLUSION

We find the testimony from Reeves was not hearsay and, even if the testimony did constitute inadmissible hearsay, its admission was harmless in light of the overwhelming evidence of Vick's guilt. Accordingly, we affirm Vick's convictions. However, because the State concedes the kidnapping sentence was erroneously imposed, and in light of the fact our courts recognize there may be exceptional circumstances allowing the appellate court to consider an improper sentence even though no challenge was made to the sentence at trial and have further summarily vacated in matters such as the one at hand, in the interest of judicial economy we vacate the clearly erroneous kidnapping sentence.

**AFFIRMED IN PART AND VACATED IN PART.**

PIEPER and GEATHERS, JJ., concur.