# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Ontavious Derenta Plumer, Appellant.

Appellate Case No. 2017-000481

————————

Appeal From Greenwood County
Edward W. Miller, Circuit Court Judge

————————

Opinion No. 5806
Heard February 11, 2020 – Filed March 3, 2021

————————

## AFFIRMED IN PART AND VACATED IN PART

————————

E. Charles Grose, Jr., of Grose Law Firm, of Greenwood,
for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Mark Reynolds Farthing, both of
Columbia; and Solicitor David Matthew Stumbo, of
Greenwood, Respondent.

————————

**LOCKEMY, C.J.:** Ontavious Derenta Plumer appeals his convictions for
attempted murder and possession of a weapon during the commission of a violent
crime, arguing the trial court erred by (1) refusing to charge the jury on the law of
self-defense, (2) denying his motion to relieve trial counsel, (3) refusing to qualify
a witness as an expert in gunshot residue analysis, and (4) sentencing him to an
additional five years' imprisonment in addition to his sentence of life without
parole.  We affirm in part and vacate in part.

**FACTS**

On October 11, 2015, Oshamar Wells was shot during the course of a drug transaction. Wells later identified Plumer in a photographic lineup as the person who shot him. In July 2016, Plumer was indicted for attempted murder, armed robbery, and possession of a weapon during the commission of a violent crime. He proceeded to a jury trial on February 6, 2017.[1]

At trial, Wells testified that he had arranged to meet two men, who were supposed to purchase a pound of marijuana from him, around 6:00 p.m. on the evening of October 11.[2] Wells explained someone he knew setup the deal, he had never met the men before, and he did not know their names. Wells testified he planned to meet the two men at a convenience store in Greenwood and then have them follow him to his cousin's residence because the men were unfamiliar with the area. The men followed Wells in their black Mercedes and parked behind him in the driveway.[3] After they arrived at the home, they smoked marijuana so that the two men could "try the product" before proceeding with the purchase. Wells explained that after some time passed, he began to wonder when the men were going to pull out cash to pay for the marijuana. Plumer pulled out a gun instead. Wells testified that as soon he saw what Plumer was doing, he turned around and retrieved a handgun from the cabinet behind him.[4] He stated he shot at Plumer in defense of his life. Wells explained that Plumer then began firing at him and recalled he was "already getting hit when [he] reached to grab the gun out of the cabinet. And from the[n on, he] just returned fire." Wells stated that after the shooting began, the third man got up, took the marijuana, and ran. Wells did not recall seeing the

---

[1] Prior to trial, the State served Plumer with a notice of intent to seek life imprisonment without the possibility of parole based on his previous conviction for a most serious offense. *See* S.C. Code Ann. § 17-25-45(A)(1)(a) (2015) (providing that "upon a conviction for a most serious offense . . . a person must be sentenced to a term of imprisonment for life without the possibility of parole if that person has . . . one or more prior convictions for . . . a most serious offense"); S.C. Code Ann. § 17-25-45(C)(1) (2015 & Supp. 2020) (stating offenses defined as "most serious" include attempted murder and attempted armed robbery).
[2] Wells testified a pound of marijuana carried a street value of about $3,600.
[3] No one else was present at the home when the three men arrived.
[4] Wells testified the gun belonged to his mother and he saw her place the holstered gun there earlier that day.

third man with a gun. Wells testified that as he returned fire at Plumer, Plumer continued to fire at him while backing out of the door.

Bullets struck Wells in his back, buttocks, and legs. He testified that as soon as the men were gone, he called his mother and an ambulance. Wells was taken to the local hospital in Greenwood, where Dr. Ricky Ladd treated him for his gunshot injuries. Dr. Ladd testified Wells was admitted with potentially life-threatening injuries. He explained Wells suffered six gunshot wounds consisting of wounds to the left upper buttock, the lower back region, the left anterior thigh, the right lateral thigh, and an entrance and exit wound to the left lower leg.

The same night, Plumer received treatment at Greenville Memorial Hospital for a gunshot wound to his kneecap. A Greenville County law enforcement officer interviewed him at the hospital that evening. Plumer told the officer that as he was walking down the street after leaving a friend's apartment in Greenville, a man he did not know approached him from behind and started shooting at him. Plumer stated he ran away when the shooting started. The officer testified that, at the time, law enforcement had no reason to suspect Plumer had fired a gun that night.

Wenona Wells, Wells's mother, testified the gun in the cabinet, which she identified at trial, belonged to her. She explained that when she went to the home the night of the shooting, her young grandson was with her and he found and picked the gun up off the floor. Ms. Wells testified she took the gun from him and when they left, she placed it in the trunk of her car. However, she testified she did not know Wells had used it during the altercation. Ms. Wells stated that about three days later, she turned the gun over to law enforcement at Wells's request.

Wells acknowledged that when law enforcement first approached him, he was not forthcoming because he was afraid they would charge him with selling drugs. Investigator William Kay, of the Greenwood Police Department, testified he took a statement from Wells the day after the shooting. Investigator Kay stated that in his first statement to law enforcement, Wells said that "two random guys came in the front door and tried to rob him" while he was sitting at his kitchen table and "ended up shooting him." He testified Wells gave a second statement to law enforcement in which he explained that he met two men to sell them marijuana, that they ended up trying to rob him, that he reached for a gun to defend himself, and that they began shooting and he returned fire. Law enforcement showed Wells a photographic lineup and he selected Plumer from the lineup as the person who shot him.

Thereafter, law enforcement arrested Plumer, and Plumer gave a statement admitting he was at the residence at the time of the incident and had also been shot. In addition, Greenwood officers determined the Mercedes parked behind Wells's car in the driveway belonged to Plumer's grandfather, who had loaned it to Plumer on the night of the shooting, and a blood sample retrieved from the sidewalk in front of the home matched Plumer's DNA profile.

Plumer did not testify at trial, but he called several defense witnesses. Shameka Hawes testified that on the evening of the shooting, she was sitting in her car when Plumer ran up to her and asked for a ride to the hospital. She stated she could see he had been shot. Hawes explained that on the way to the hospital, Plumer asked her to drop him off at his baby's mother's apartment instead. Hawes stated she did not know Plumer before this encounter and never saw him again afterwards. Plumer's cousin, Vanjarvis Martin, testified that on October 11, 2015, he picked Plumer up from his baby's mother's house and drove him to the hospital. Martin stated Plumer did not want to go to the Greenwood hospital, so he drove him to Greenville Memorial Hospital instead.

Deputy Wesley Smith, of the Greenville County Sheriff's Office, testified the sheriff's office performed a gunshot residue collection kit on and collected some evidence, including clothing, from Plumer at approximately 11:15 p.m. on October 11, 2015. He recalled that some of the evidence was covered in blood. Deputy Smith stated that between the time Plumer was admitted to the hospital at 10:55 p.m. and when he was released, there was a period of up to twenty-five minutes during which no one from law enforcement was with him. Deputy Smith explained the sheriff's office never completed an examination of the evidence and ultimately transferred it to Detective McClinton a few months later. The defense recalled Detective McClinton, who confirmed he received this evidence but it was never sent to the South Carolina Law Enforcement Division for analysis.

Joseph Best, a private detective hired by the defense, testified he collected the evidence from the Greenwood Police Department on January 6, 2017, and transferred it to Dr. Robert Bennett on January 10, 2017. Best testified the evidence included a gunshot residue kit that was collected from Plumer's hands, a tennis shoe, jeans, and a tee shirt.

The defense then called Dr. Robert Bennett, who testified he was a forensic scientist and held a pharmacy degree and a doctorate in drug sciences with a focus in toxicology. He stated he had "a number of training certifications from the Department of Justice, [including] a couple in the are[a] of firearms." Dr. Bennett

explained that the firearms training included "looking at a variety of subjects such as different types of ballistics, which include[d] gunshot residue analysis" and that he was "familiar" with gunshot residue and had "learned to test gunshot residue." Dr. Bennett explained that he worked with a lab that performed gunshot residue analysis as one of their "basic core service provisions." He admitted he had never personally performed a gunshot residue test and was instead interpreting the results of the test the lab performed. The State objected to Dr. Bennett's qualification, and the court refused to qualify him as an expert witness. Plumer did not attempt to proffer Dr. Bennett's testimony.

At the close of the defense's case, Plumer renewed his motion for a directed verdict, which the trial court denied. Plumer requested a jury charge on the law of self-defense, which the trial court denied, finding there was "insufficient evidence from which a reasonable inference could be drawn" that Plumer acted in self-defense.

The jury acquitted Plumer of armed robbery but found him guilty of attempted murder and possession of a weapon during the commission of a violent crime. Plumer moved for a new trial, arguing the jury returned an inconsistent verdict. The trial court denied the motion and sentenced Plumer to life imprisonment without parole for attempted murder and five years' imprisonment for the weapon offense. This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006).

## ANALYSIS

## I. Self-Defense Instruction

Plumer argues the trial court erred by refusing to instruct the jury on the law of self-defense. He contends the following facts would have supported an inference that Wells was the first person to introduce a firearm and was therefore responsible for bringing on the difficulty: (1) Wells admitted he was prepared to use his gun during the drug transaction and placed himself in a position that would allow him to stand up and reach his gun; (2) according to Investigator Kay, Wells stated he reached for his gun before Plumer fired any shots; (3) according to Dr. Ladd, Wells would have fallen down when the bullet struck his femoral neck, meaning he stood

up and retrieved his handgun before Plumer fired that shot; (4) Wells and Ms. Wells conspired to hide the gun and cover up his culpability; (5) Plumer retreated from the violence; and (6) the jury acquitted Plumer of armed robbery, which removed the motive to commit murder.  We disagree.

"A self-defense charge is not required unless it is supported by the evidence." *State v. Light*, 378 S.C. 641, 649, 664 S.E.2d 465, 469 (2008).  "If there is any evidence in the record from which it could reasonably be inferred that the defendant acted in self-defense, the defendant is entitled to instructions on the defense, and the trial judge's refusal to do so is reversible error."  *State v. Slater*, 373 S.C. 66, 70, 644 S.E.2d 50, 52 (2007).

> To establish self-defense in South Carolina, four elements must be present: (1) the defendant must be without fault in bringing on the difficulty; (2) the defendant must have been in actual imminent danger of losing his life or sustaining serious bodily injury, or he must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) if his defense is based upon his belief of imminent danger, defendant must show that a reasonably prudent person of ordinary firmness and courage would have entertained the belief that he was actually in imminent danger and that the circumstances were such as would warrant a person of ordinary prudence, firmness, and courage to strike the fatal blow in order to save himself from serious bodily harm or the loss of his life; and (4) the defendant had no other probable means of avoiding the danger.

*Id.* at 69-70, 644 S.E.2d at 52; *see also State v. Muller*, 282 S.C. 10, 10, 316 S.E.2d 409, 409 (1984) (holding when the defendant testified he shot the victim after the victim "took out a gun and began shooting at him," the trial court erred by refusing to charge the law of self-defense because the defendant's testimony "constituted sufficient evidence from which the jury could infer that [he] acted in self-defense"); *State v. Smith*, 406 S.C. 547, 555, 752 S.E.2d 795, 798 (Ct. App. 2013) (stating that "going to a drug deal while armed with a deadly weapon is evidence of fault in bringing on the difficulty"); *State v. Jackson*, 227 S.C. 271, 278, 87 S.E.2d 681, 684 (1955) (stating "one cannot through his own fault bring on a difficulty and then claim the right of self-defense").

In *Slater*, our supreme court found there was no evidence to show the defendant was "without fault in bringing on the difficulty" and he was therefore not entitled to a self-defense instruction. 373 S.C. at 71, 644 S.E.2d at 53. There, the court concluded the defendant's actions of carrying a "cocked weapon, in open view, into an already violent attack in which he had no prior involvement . . . . proximately caused the exchange of gunfire, and ultimately the death of the victim." *Id.*

We conclude the trial court did not err by refusing to charge the law of self-defense because the record contains no evidence that Plumer was without fault for bringing on the difficulty. *See Light*, 378 S.C. at 649, 664 S.E.2d at 469 ("A self-defense charge is not required unless it is supported by the evidence."); *State v. Goodson*, 312 S.C. 278, 280, 440 S.E.2d 370, 372 (1994) ("The law to be charged to the jury is determined by the evidence presented at trial."); *Light*, 378 S.C. at 649, 664 S.E.2d at 469 (providing self-defense requires the defendant to "be without fault in bringing on the difficulty"). Of the three individuals present when the shooting occurred, only Wells testified at trial. Although it is undisputed Wells fired a gun during the encounter, he consistently testified Plumer was the first to draw and fire a gun. The record contains no evidence to contradict Wells's testimony that he stored a holstered handgun in a cabinet prior to the meeting and did not retrieve it until after Plumer pulled out a gun. Further, the record contains no evidence Wells was visibly armed or that Plumer knew Wells had a gun nearby when Plumer pulled out his own gun. Wells stated he shot at Plumer because Plumer was shooting at him and that if Plumer had not pulled out his gun first, he would not have retrieved the gun from the cabinet. Even though Wells's treating physician agreed the gunshot injury to his hip would likely have caused him to fall immediately, he testified it was impossible to determine which of Wells's gunshot injuries occurred first or otherwise discern the timing of those injuries. In addition, Wells testified that bullets were already striking him when he turned to retrieve the gun from the cabinet. As to Investigator Kay's testimony, he testified only that Wells initially told law enforcement that two random men came into his home, tried to rob him, and ended up shooting him. This testimony does nothing to suggest Wells, rather than Plumer, was at fault for bringing on the difficulty. As to Plumer's contention that Wells and Ms. Wells conspired to hide the gun, Wells admitted he initially withheld the truth from law enforcement because he was afraid he would get in trouble for dealing marijuana, and he admitted to shooting a gun that night. Further, Ms. Wells explained she took possession of the gun the night of the shooting because it belonged to her; she was concerned for the safety of her young grandson, who had just picked the gun up off of the floor; she did not know it was involved in the shooting; and she was most concerned with Wells's

condition at the time.  In addition, Ms. Wells testified she turned the gun over to law enforcement within days of the incident.  Regardless, the suggestion that Wells conspired to hide the gun made it no more or less likely that Wells was the first to present a gun or that Plumer was without fault in bringing on the difficulty.

Next, as to Plumer's contention he retreated from the violence, the evidence shows he only did so after firing his gun multiple times.  Moreover, such facts pertain to whether he had a means of avoiding the danger rather than whether he was at fault for bringing on the difficulty.  Finally, we find Plumer's argument regarding his acquittal for the charge of armed robbery is without merit.  The lack of motive to commit murder is not an element of self-defense, nor does it negate Wells's testimony that Plumer drew a gun without any prior act of provocation or aggression on Wells's part.

Based on the foregoing, we find the only evidence presented at trial suggested that Plumer was at fault for bringing on the difficulty.  Therefore, the record contained no evidence from which a jury could have inferred Plumer acted in self-defense, and we find the trial court did not err by refusing to give a self-defense instruction.[5]

## II.  Motion to Relieve Trial Counsel

Plumer argues the trial court should have treated his insistence to relieve his trial counsel as a motion to represent himself and the court denied him his Sixth Amendment right to represent himself by permitting counsel to continue representing him.  We disagree.

"A South Carolina criminal defendant has the constitutional right to represent himself under both the federal and state constitutions." *State v. Barnes*, 407 S.C. 27, 35, 753 S.E.2d 545, 550 (2014).  Thus, "[a]n accused may waive the right to counsel and proceed *pro se.*" *State v. Winkler*, 388 S.C. 574, 586, 698 S.E.2d 596, 602 (2010); *see also Faretta v. California*, 422 U.S. 806 (1975) (holding a criminal defendant has the right to waive his right to counsel and proceed pro se when he chooses to do so voluntarily and intelligently).  "The request to proceed pro se must be clearly asserted by the defendant prior to trial." *Winkler*, 388 S.C. at 586,

---

[5] We note Plumer asserts the trial court inappropriately involved itself in plea negotiations.  Because Plumer raised no exception on this basis at trial, this argument is unpreserved for our review.  *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693-94 (2003) ("Issues not raised and ruled upon in the trial court will not be considered on appeal.").

698 S.E.2d at 602 (quoting *State v. Fuller*, 337 S.C. 236, 241, 523 S.E.2d 168, 170 (1999)); *see also Barnes*, 407 S.C. at 35, 753 S.E.2d at 550 ("So long as the defendant makes his request prior to trial, the only proper inquiry is that mandated by *Faretta*.").

Here, Plumer informed the court on the morning of the third day of trial that he wished to relieve his trial counsel and presented a written motion to relieve counsel or, in the alternative, for a competency evaluation. After the court confirmed Plumer had no competency issues, Plumer stated he wished to relieve counsel and find another lawyer. He alleged his trial counsel failed to relay a plea offer of seven years' imprisonment and he was unaware he faced a mandatory sentence of life without parole. Plumer's counsel denied this, and the trial court refused to suspend the trial to allow Plumer to hire new counsel.

We find Plumer did not clearly assert his right to self-representation. Plumer's written motion was styled as a "motion declining or terminating representation," and he told the trial court he wanted another lawyer. We acknowledge Plumer argued he had "a constitutional right to relieve [his] lawyer when [he] want[ed] to relieve him"; however, he never stated he wished to represent himself for the remainder of the trial. Rather, he repeatedly stated he wanted to hire a different lawyer. Because we conclude Plumer failed to clearly assert his right to proceed without counsel, *Faretta* warnings were not required, and the trial court did not deprive Plumer of his right to self-representation.

## III. Expert Witness

Plumer argues the trial court erred by refusing to allow Dr. Bennett to testify as an expert in gunshot residue. He contends the record established Dr. Bennett had the necessary education, training, and experience to testify as an expert and the exclusion of this expert testimony denied Plumer his constitutional right to a complete defense. We find Plumer failed to preserve this issue for appellate review.

"The trial court's decision to admit expert testimony will not be reversed on appeal absent an abuse of discretion." *State v. Price*, 368 S.C. 494, 498, 629 S.E.2d 363, 365 (2006). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or a factual conclusion that is without evidentiary support." *Id.* "For an error to warrant reversal, however, the error must result in prejudice to the appellant." *State v. Santiago*, 370 S.C. 153, 162, 634 S.E.2d 23, 28 (Ct. App. 2006).

We find this issue is unpreserved for appellate review because Plumer made no request or attempt to proffer Dr. Bennett's testimony at trial. *See id.* at 163, 634 S.E.2d at 29 ("[A] proffer of testimony is required to preserve the issue of whether testimony was properly excluded by the trial judge, and an appellate court will not consider error alleged in the exclusion of testimony unless the record on appeal shows fairly what the excluded testimony would have been."); *see also State v. King*, 367 S.C. 131, 137, 623 S.E.2d 865, 868 (Ct. App. 2005) ("The reason for the rule requiring a proffer of excluded evidence is to enable the reviewing court to discern prejudice.").

## IV. Sentencing

Plumer argues the trial court erred by sentencing him to an additional five years' imprisonment for the weapons charge pursuant to section 16-23-490. We agree.

> If a person is in possession of a firearm or visibly displays what appears to be a firearm . . . during the commission of a violent crime and is convicted of committing or attempting to commit a violent crime as defined in Section 16-1-60, he must be imprisoned five years, in addition to the punishment provided for the principal crime. *This five-year sentence does not apply in cases where the death penalty or a life sentence without parole is imposed for the violent crime.*

S.C. Code Ann. § 16-23-490(A) (2015) (emphasis added); *see also* S.C. Code Ann. § 16-1-60 (2015 & Supp. 2020) (defining attempted murder as a violent crime).

"[T]his Court has consistently held that a challenge to sentencing must be raised at trial, or the issue will not be preserved for appellate review." *State v. Johnston*, 333 S.C. 459, 462, 510 S.E.2d 423, 425 (1999), *disapproved of by State v. Vick*, 384 S.C. 189, 682 S.E.2d 275 (Ct. App. 2009). In *Johnston*, our supreme court vacated an illegal sentence notwithstanding preservation rules. *See id.* at 463-64, 510 S.E.2d at 425. There, the court found there were exceptional circumstances in that the State conceded "the trial court committed error by imposing an excessive sentence," and there was a "real threat" that the defendant would "remain incarcerated beyond the legal sentence due to the additional time it w[ould] take to pursue [post-conviction relief]." *Id.*

In *Vick*, this court acknowledged the holding in *Johnston*, but addressed the sentencing issue even though there was no "threat" that the appellant would "remain incarcerated beyond the legal sentence." *Vick*, 384 S.C. at 202-03, 682 S.E.2d at 281-82. The court reasoned, "[O]ur courts have, in the past, 'summarily vacated' sentences for kidnapping whe[n] such sentences were precluded by [statute] because the defendant received a concurrent sentence under the murder statute." *Id.* at 202, 682 S.E.2d at 282. The court also noted that "our courts have at times considered an issue in the interest of judicial economy." *Id.* In *Vick*, we held:

> [B]ecause the State concede[d] the kidnapping sentence was erroneously imposed, and in light of the fact our courts recognize there may be exceptional circumstances allowing the appellate court to consider an improper sentence even though no challenge was made to the sentence at trial and have further summarily vacated in matters such as the one at hand, in the interest of judicial economy we vacate the clearly erroneous kidnapping sentence.

*Id.* at 203, 682 S.E.2d at 282.

In *Bonner*, we vacated a defendant's sentence notwithstanding preservation rules when both parties fully briefed the issue, and we stated, "[T]his case presents an exceptional circumstance because the State concedes in its brief that the trial court committed error by imposing an improper sentence." *See State v. Bonner*, 400 S.C. 561, 567, 735 S.E.2d 525, 528 (Ct. App. 2012).

Plumer was convicted of attempted murder, a violent crime under section 16-1-60. The trial court sentenced him to life without parole for attempted murder and an additional five years' imprisonment for possession of a weapon during the commission of a violent crime. *See* § 16-23-490(A) (providing the five-year sentence required for possessing a firearm during the commission of a violent crime does not apply when the trial court imposes a sentence of life imprisonment without parole for the violent offense). Although the State argues the issue is unpreserved because Plumer failed to object at trial, it concedes the trial court erred by imposing the five-year sentence and acknowledges that under certain circumstances, our appellate courts have decided such issues on the merits notwithstanding preservation rules. The State argues, however, that the appropriate procedure for raising the issue is in post-conviction relief. Although

there is no "real threat" Plumer will remain incarcerated beyond the length of his legal sentence, because the State concedes error, we believe it is appropriate under these circumstances and as a matter of criminal equity to vacate the sentence pursuant to our holdings in *Bonner* and *Vick*. *See Bonner*, 400 S.C. at 567, 735 S.E.2d at 528 (opining a "case present[ed] an exceptional circumstance because the State concede[d] in its brief that the trial court committed error by imposing an improper sentence"). We therefore vacate the five-year sentence Plumer received for the weapons charge.

## CONCLUSION

For the foregoing reasons, we affirm Plumer's convictions but vacate the trial court's imposition of the five-year sentence for the weapons charge.

**AFFIRMED IN PART AND VACATED IN PART.**

**GEATHERS and HEWITT, JJ., concur.**